# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

DAVID P. GRIFFIN,                    :

            Plaintiff,       :
                                              Case No. 3:07CV0447

  vs.                          :

                                              District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                   :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,             :

           Defendant.       :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff David P. Griffin formerly worked in sales and as an assistant manager in the retail industry. (Tr. 86). He alleges that he became disabled on November 22, 1999, due to problems with seizures, a cracked bone in his lower spine, and weak legs. (Tr. 85). He consequently sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] on December 17, 2002.

After various administrative proceedings, Administrative Law Judge

---

[1]Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

["ALJ"] Melvin A. Padilla denied Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 30). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply to Defendant's Memorandum in Opposition, (Doc #10), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision or, at a minimum, a remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    FACTUAL BACKGROUND

On the date he last was insured, Plaintiff's age [54] placed him in the category of "closely approaching advanced age" for purposes of resolving his DIB application. *See* 20 C.F.R. § 404.1563(d); (*see also* Doc. # 8 at 2). He has a high school education and two years of college courses. (Tr. 91).

Plaintiff testified during the hearing before the ALJ that he last worked in

1999, for two weeks at Lowe's. (Tr. 935). Despite having a driver's license, he claimed not to have driven since 1999. (Tr. 934). Plaintiff testified that he was unable to work because "I have fainting spells a lot, black-outs. [M]y legs go weak on me. And even my back gives out on me." (Tr. 936). Plaintiff further noted that he frequently gets nervous, which brings on seizures. (Tr. 947). He testified that he gets nervous in crowds of five to six people. (Tr. 951). He also has tried to commit suicide three times. (Tr. 943).

Testifying to his daily activities, Plaintiff said he left his house only about twice a week. He might visit a cousin, but did not attend church. (Tr. 939). He spent most of the day sleeping. He stated that he shopped with his wife about once a month, and tried to do chores as he was able. His wife prepared his meals and he simply heated them up. (Tr. 940-41). He went fishing with his wife, did crossword puzzles, played computer games, went out to eat about once a month, and watched television. He also tried to exercise on a treadmill for 15-20 minutes a day to strengthen his legs. (Tr. 941).

Plaintiff testified that counseling and medication helped his depression. (Tr. 942). He denied side effects from the medication. (Tr. 943). He testified that he cries two or three times a week. Plaintiff claimed to be able to stand for 30 minutes, lift five pounds, and sit for a couple of hours. (Tr. 952-53).

The parties have provided detailed and informative descriptions of Plaintiff's medical records, supported with many specific citations to evidence in the administrative record. (*See* Doc. #8 at 3-10; Doc. #9 at 4-13). In light of this, and upon the Court's consideration of the record as a whole, additional detailed discussion of the entire record would be unnecessarily duplicative. Nevertheless, a general identification of the medical sources upon whom the parties rely will help to frame further review.

Plaintiff relies on the opinion of Michael J. Valle, D.O., a neurologist who treated Plaintiff between October 1997 and July 2003 . (Tr. 451-79). On August 5, 1998, Dr. Valle noted that Plaintiff had a long history of seizure-like activity, though all EEG studies were normal, making it difficult to diagnosis among true epilepsy, non-epileptogenic pseudoseizures, and a mixture of the two. (Tr. 475).

On May 19, 1999, Dr. Valle reported that Plaintiff "remains seizure or 'spell' free." (Tr. 474). His Depakote level was low, suggesting less than optimal compliance with his medication regimen, although "his coworkers have been pushing him in the right direction." (*Id*.). Dr. Valle indicated that if Plaintiff did well, follow-ups would be scheduled at six month intervals. In a letter dated September 27, 1999, however, Dr. Valle commented that Plaintiff had "made the circuit to various ERs in town with what seemed to be an anxiety reaction." (Tr.

472).  He planned to see Plaintiff in four months.

During a February 22, 2000 appointment, Plaintiff told Dr. Valle that he
had had "one light spell" several days before, "but otherwise "has been doing
fairly well."  (Tr. 468).  Dr. Valle's impression remained one of non-epileptogenic
pseudoseizures.  He recommended follow-up in six months.  (Tr. 468).  On
August 8, 2000, Plaintiff reported spells when his Depakote level was low.  (Tr.
465).  Noting that Plaintiff was "doing fairly well," Dr. Valle left his medication
unchanged.  (*Id.*).

On May 29, 2001, Plaintiff reported to Dr. Valle that he had one seizure in
January, but he and his wife had "difficulty describing this," and "certainly did
not go into the Emergency Department."  (Tr. 461).  Dr. Valle noted that several
months earlier, he had discontinued "the homeopathic dose of Zoloft that
[Plaintiff] had insisted upon taking for so long."  (*Id.*).  Plaintiff generally felt
better, with his mood "quite good."  (*Id.*).

On December 12, 2001, Dr. Valle reported that Plaintiff had had two
seizure episodes over the summer related to his son's divorce, but that his
condition had settled down and he had "done quite well" since then.  (Tr. 458).
The same day, Dr. Valle prepared a "To Whom It May Concern letter," as
follows:

Mr. Griffin is a patient for whom I care for non-epileptogenic pseudoseizures. This is a condition known as a conversion disorder. By its very nature, it is beyond his control. The spells that occur look very much like a grand mal seizure and are very typically evoked by stress.

Given the nature of the patient's neurologic/psychological problems, I believe that the patient would have breakthrough non-epileptogenic pseudoseizures if he were asked to testify in court. These could be quite deleterious to him and result in a significant medical setback.

(Tr. 457).

On March 19, 2003, Plaintiff was seen after two falls unrelated to any syncope sent him to the hospital. (Tr. 453). Dr. Valle noted that Plaintiff's physical problems were improving over time, with his numbness and strength both better. Examination revealed "[g]iveaway weakness in the lower extremities," although he ambulated fairly well with a walker, and diagnostic tests were normal. (*Id.*). After reviewing the hospital records, Dr. Valle opined that Plaintiff's weakness was "of a functional origin and should improve over time." (Tr. 453-54). After evaluating Plaintiff on July 29, 2003, Dr. Valle noted that "[o]verall he is doing fairly well." (Tr. 451). Plaintiff reported only one spell and felt "pretty good," despite some leg weakness. (*Id.*). Dr. Valle continued Plaintiff's medication regimen and indicated that he would see Plaintiff in six to

nine months.  (Tr. 452).

On June 24, 2005, Dr. Valle prepared a narrative report for Plaintiff's attorney.  (Tr. 851).  He stated that he had treated Plaintiff since 1997 for a possible seizure disorder, which time revealed to be nonepileptogenic pseudoseizures, but had been "no longer involved in [Plaintiff's] care" since May 12, 2004.  (*Id.*).  Dr. Valle continued:

> [Plaintiff] very easily could have a "spell" which was nonepileptogenic in nature with a variety of stressors. These could come on quite easily and very significantly limit his interaction with other individuals.  I had initially started him on the medication, Depakote, for possible seizure disorder and continued this medication, as it is helpful at stabilizing patient's psychiatric conditions.

(*Id.*).  Dr. Valle also noted that Plaintiff experienced other "conversional spells" in the form of paralysis.  (*Id.*).  He concluded, "Given these severe psychiatric disturbances that arise unpredictably, the patient is not able to work on a full or part time basis."  (*Id.*).  While Plaintiff "does not suffer from any physical disorder that would cause him difficulties, . . . the severe nature of his conversion disorder profoundly limits his ability to interact with others on a consistent and safe basis for him to maintain gainful employment."  (*Id.*).

On June 25, 2005, Dr. Valle completed a "Medical Assessment of Ability to do Work-Related Activities" form.  (Tr. 852-55).  Physically, Plaintiff was found to

have no limitations other than balancing, climbing, and working at heights and around moving machinery. (Tr. 853-54). Dr. Valle claimed, however, that Plaintiff was unable to work due to conversion disorder (*i.e.*, stress-induced pseudoseizures). (Tr. 855). He also claimed that Plaintiff lacked the ability to perform any mental work-related functions due to Plaintiff's "history and my clinical observations of the patient in the office and hospital." (Tr. 858).

The Commissioner relies on the opinion of J. William McIntosh, Ph.D., a consulting psychologist who evaluated Plaintiff on May 13, 2003. (*See* Tr. 421-425). During this consultation, Plaintiff reported a variety of problems related to his back, blood clots and cholesterol. (Tr. 421). He advised that he had taken Depakote, and later Klonopin, for pseudoseizures, which for 25 years had been causing him to get upset and to shake. (Tr. 421-22). Plaintiff also complained about his poor health and recent hospitalizations for temporary paralysis. (Tr. 421). Plaintiff walked with the aid of a walker. (Tr. 422). He reported feeling nervous when at home by himself, but feeling calmer with his wife, and also comforted by his dog. (Tr. 423).

Plaintiff reported that his last job, at Lowe's, ended in 1999, after he had a seizure at work. (Tr. 422). Plaintiff was "vague about when he had last had a seizure," but claimed to have them two to three times per week. (*Id.*). Dr.

8

McIntosh deemed Plaintiff a reliable reporter of information, but "had a hard time understanding what his seizures were like." (*Id.*). When asked why he was unable to work, Plaintiff blamed "the problem with my back," saying "[m]y legs go numb" and "[i]t hurts me to sit or to stand very long." (*Id.*). Cognitively, Plaintiff both appeared and reported himself to be functioning "fairly well." (Tr. 423).

Based on his clinical interview, Dr. McIntosh concluded that Plaintiff suffered pseudoseizures, but possessed a "fairly good" ability to understand, remember and carry out one- and two-step instructions; could interact "fairly well" with supervisors and co-workers familiar with his limitations; and had an "at least moderately good" ability to maintain concentration and attention. (Tr. 424-25). While judging Plaintiff's ability to handle stress and daily work pressure "to be mildly to moderately limited" (Tr. 425), Dr. McIntosh also noted that Plaintiff's judgment "d[id] not seem to be impaired," and that he had "some insight into the degree of stress he is under from his various physical problems." (Tr. 423).

## III. ADMINISTRATIVE REVIEW

To qualify for DIB, a claimant must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under

a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish

disability, a claimant must prove that he or she suffers from a medically

determinable physical or mental impairment that can be expected to result in

death or has lasted or can be expected to last for a continuous period of not less

than 12 months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must

render the claimant unable to engage in the claimant's previous work or in any

other substantial gainful employment which exists in the national economy. 42

U.S.C. § 423(d)(2).

The Commissioner has established a sequential evaluation process for

disability determinations. 20 C.F.R. § 404.1520. At step one, the claimant must

show that he is not currently engaging in "substantial gainful activity," 20 C.F.R.

§ 404.1520(b), as defined in the regulations. See 20 C.F.R. § 220.141 (2002). At

step two, the claimant must show that he suffers from a "severe impairment." 20

C.F.R. § 404.1520(c). If the claimant fails to make the proper showing at either

step one or two, he will be denied benefits. At step three, a claimant may attempt

to demonstrate that his disability meets or equals an impairment listed in

Appendix 1 to Subpart P of Part 404 ["Listing of Impairments"]. 20 C.F.R. §

404.1520(d). If the impairment meets or equals a listed impairment ["Listing"],

the claimant is considered disabled and the evaluation process ends. If, however,

the claimant's impairments do not satisfy step three, the process continues to step four.

At step four, the claimant must demonstrate that he does not have sufficient residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(e). Residual functional capacity is "what [he] can still do despite his limitations." 20 C.F.R. § 404.1545(a). If the claimant fails to make the necessary showing at step four, he will be denied benefits. If he satisfies step four, the inquiry moves to step five. At step five, the burden shifts to the Commissioner to show that the claimant can perform "other work." 20 C.F.R. § 404.1520(f). "Other work" must consist of jobs that exist in significant numbers in the national economy that the claimant can perform given his age, education, past work experience, and residual functional capacity. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). At the fourth and fifth steps, the ALJ often seeks advisory testimony from a vocational expert.

In the present case, it is undisputed that Plaintiff was not engaged in substantial gainful employment at the time of his disability application. The ALJ found at Step 2 that Plaintiff had the severe impairments of conversion disorder

with pseudoseizures, and affective disorder with depression and anxiety features (Tr. 21, Finding 3), but determined at Step 3 that those impairments' severity did not meet or equal one in the Listings.  (Tr. 25, Finding 4).  At Step 4, the ALJ found that the Plaintiff has the Residual Functional Capacity to perform the physical requirements of work at all exertional levels with the following non-exertional restrictions:

> no working at unprotected heights or around moving machinery; climbing and balancing limited to occasionally; and low stress jobs with no dealing with the public, no production quotas, no fast paced work, and no more than minimal contacts with supervisors and coworkers.

(Tr. 25, Finding 5).  The ALJ's assessment of Plaintiff's residual  functional capacity, along with the ALJ's findings throughout his sequential evaluation, led him to conclude that Plaintiff was not under a disability and thus not eligible to receive DIB.  (Tr. 18-30).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings, and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Id.* 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "more than a scintilla of evidence but less than a preponderance . . ."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994).  The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as [they are] substantially supported in the record."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F.3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.*, (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.     DISCUSSION

### A.     The Parties' Contentions

Plaintiff contends that the ALJ erred by rejecting the opinion of Dr. Valle, his long-term treating neurologist, and by crediting the opinion of Dr. McIntosh, a one-time examining psychologist.  Plaintiff reasons that the ALJ failed to properly analyze Dr. Valle's opinion according to 20 C.F.R. § 404.1527 and *Wilson*, 378 F.3d 541.  (Doc. #8 at 13–18).  Plaintiff further contends that ALJ Padilla improperly failed to call a medical expert to make a determination of the onset date of Plaintiff's disabling condition, in accordance with SSR 83-20.  (Doc. #8 at 19-16).

The Commissioner argues that the ALJ appropriately rejected Dr. Valle's opinion, which was rendered more than two years after the March 31, 2003 expiration of Plaintiff's insured status and gave no indication that it related back to or accurately represented Plaintiff's condition during the relevant insured period.  (Doc. #9 at 14-15).  The Commissioner further contends that analyzing Dr. Valle's opinion under the factors enumerated at 20 C.F.R. § 404.1527 and in *Wilson*, *supra*, provides validation for the ALJ's decision not to defer to that opinion as to the psychological components of Plaintiff's claim.  (Doc. #9 at 13-19).  The Commissioner thus asserts that the ALJ's decision is supported by

14

substantial evidence.

**B.** **Medical Source Opinions**

The Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source. *See* 20 C.F.R. § 416.927(d). The treating physician rule provides that a treating physician's opinion is entitled to controlling weight so long as it is (1) well supported by medically acceptable data, and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. § 416.927(d)(2); *see Wilson*, 378 F.3d at 544. When these requirements are not met, the treating physician rule does not apply. *Id.*

If the ALJ concludes that a particular treating source's opinion is not entitled to controlling weight under the rule, the ALJ must continue to evaluate that treating source's opinion by considering the following additional factors:

1. The length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship;

2. The 'supportability' of the opinion – whether it is supported with relevant evidence and whether it is well explained;

3. The consistency of the opinion with the record as a whole;

4. The specialization, if any, of the treating source; and

5. 'Other factors' brought to the ALJ's attention, including, for example, the treating source's knowledge of the SSI or DIB programs and its evidentiary requirements.

20 C.F.R. § 404.1527(d)(2)-(6); *see Wilson*, 378 F.3d at 544.

As to non-treating medical sources – such as one-time examiners or medical experts who testify during the administrative hearing – ALJs must evaluate their opinions under the same factors applicable to treating medical sources, *i.e.,* supportability, consistency, specialization, *etc.* *See* 20 C.F.R. § 404.1527(d), (f). The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. § 404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion"); *see* also 20 C.F.R. § 404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. § 404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

C.    <u>**Analysis**</u>

*i. ALJ's Assessment of Medical Opinions of Record*

In his opposing memorandum, the Commissioner argues that "Dr. Valle's status as a treating physician" is "questionable" because Dr. Valle "did not see Plaintiff on an ongoing basis and could not provide insight into his mental condition" (Doc. #9 at 14, 15), thus implying that the ALJ was not required to analyze Dr. Valle's opinion as that of a treating source. Neither the records of Plaintiff's treatment with Dr. Valle nor case law in this Circuit, however,

supports the Commissioner's suggestion that "Dr. Valle's sparse and very limited treatment history with Plaintiff hardly warrants application of the treating physician rule." (*See id.* at 14).

"A physician qualifies as a treating source if the claimant sees [him] 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (citing 20 C.F.R. § 404.1502). "A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.'" *Id.*

The record before us indicates that Dr. Valle saw Plaintiff no fewer than nine times over the course of five years, for symptoms suggestive of possible neurological problems. (*See* Tr. 451-79). Indeed, the ALJ implicitly acknowledged Dr. Valle's status as a treating source, finding that Dr. Valle saw Plaintiff "about twice a year or so since the late nineties" and "is certainly entitled to some deference" as to Plaintiff's <u>physical</u> impairments. (Tr. 25). Under such circumstances, this Court is unable to agree with the Commissioner's assertion that Dr. Valle should not be viewed as a treating source.

The issue, then, becomes whether the ALJ nonetheless articulated a proper basis for declining to give Dr. Valle's opinion controlling weight as to the

allegedly disabling nature of Plaintiff's psychiatric condition. The Court finds that he did. Assigning greater weight to a treating physician's opinion than to that of the government physicians is appropriate only if the treating physician supplies sufficient medical data to substantiate his opinion. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also Bogle v. Sullivan*, 998 F.2d 342 (6th Cir. 1993). Moreover, an ALJ generally must give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist" in that field. *Roush v. Barnhart*, 326 F.Supp.2d 858, 867 (S.D. Ohio 2004) (Spiegel, J.) (citing 20 C.F.R. § 404.1527(d)(5)). A treating physician's broad conclusory formulations regarding the ultimate issue of disability – which must be decided by the Commissioner – also are not determinative of the question of whether an individual is under a disability. *Kirk*, 667 F.2d at 538.

In the first instance, the ALJ reasonably could conclude from the record before him that Dr. Valle did not supply sufficient medical data to substantiate his June 2005 opinion that Plaintiff was disabled by conversion disorder. In December 2001, Dr. Valle reported that Plaintiff had "done quite well" since experiencing two seizure episodes the prior summer. (Tr. 458). As the ALJ noted, Dr. Valle did not order a psychiatric evaluation at that time. (Tr. 23). The

ALJ further correctly observed that Plaintiff's next visit to Dr. Valle, in March 2003, apparently was "related to the [leg] weakness" that Plaintiff then was alleging, not to a psychological complaint. (*Id.*). At that time, Dr. Valle again expressed "little doubt" that Plaintiff's reported seizures were "conversional in nature," but reported that Plaintiff was "improving over time," and noted no referral or treatment for non-physical issues. (Tr. 453). In July 2003 – as the ALJ notes, "some three to four months after the alleged onset date" of disability (Tr. 23) – Plaintiff reported only one recent "spell," and his physical examination was normal. (Tr. 451).

There is no record of Dr. Valle having seen Plaintiff again before opining that Plaintiff's "psychiatric disturbances" left him "not able to work." (Tr. 851). The ALJ pointedly stressed that Dr. Valle's disability opinion to that effect was rendered "in June <u>2005</u>" (Tr. 25) (emphasis in original) – a date significant because it falls more than two years after Plaintiff's insured status lapsed (*see* Tr. 19), as well as more than a year after Dr. Valle ceased to treat Plaintiff. (*See* Tr. 851).

Plaintiff nevertheless asserts that Dr. Valle's opinion is consistent with Plaintiff's physical manifestations of his psychological illness. That contention, however true, lacks the legal significance that Plaintiff seeks to attach to it. The

Regulations require the ALJ to consider Dr. Valle's opinions in light of all evidence of record, including not only Plaintiff's complaints, but also his hearing testimony. *See* 20 C.F.R. §§ 404.1527(b)-(e). A review of Plaintiff's testimony reveals that the ALJ reached reasonable conclusions about Plaintiff's daily activity level, based on Plaintiff's testimony that he shopped with his wife occasionally, visited his cousin, went fishing with his wife, did crossword puzzles, walked with his wife, dust mopped, played computer games, went out to eat occasionally, watched television and used a treadmill once a day. *(See* Tr. 933-59). Accordingly, the ALJ cannot be said to have erred by discounting for lack of sufficient substantiation Dr. Valle's conclusion of disability.

Additionally, the "psychiatric conditions" (Tr. 851) to which Dr. Valle attributed Plaintiff's supposed disability presumably fall outside of Dr. Valle's area of specialization, in the field of neurology. Conversely, Dr. McIntosh, the clinical psychologist on whose opinion ALJ Padilla more heavily relied regarding Plaintiff's psychiatric issues (*see* Tr. 26-27), possessed professional mental health qualifications that Dr. Valle lacked. In assessing the differing medical opinions, the ALJ specifically noted that despite Dr. Valle's "consistent opinion . . . that [Plaintiff] had non-eplileptic pseudoseizures," apparently "no psychiatric evaluation or intervention" was procured at that time to confirm that diagnosis

or to treat the presumed psychological origin of Plaintiff's symptoms. (Tr. 23).

Although Dr. Valle diagnosed Plaintiff with conversion disorder, the ALJ

accorded no deference to his finding of a psychiatric impairment, deferring to Dr.

Valle's opinion only as Plaintiff's <u>physical</u> condition. (Tr. 25). Because Dr. Valle

did not find Plaintiff to be limited physically (*see* Tr. 851), and his opinion

regarding Plaintiff's psychological condition was not confirmed by a mental

health professional during the relevant time frame before Plaintiff's insured

status lapsed, the ALJ was not required to grant Dr. Valle's opinion controlling

weight. See 20 C.F.R. § 404.1527(d) (listing "specialization" among appropriate

factors to consider in weighing physician opinions).

Discounting Dr. Valle's opinion for the foregoing reasons, the ALJ based

his residual functional capacity evaluation on the assessment of Dr. McIntosh,

who examined Plaintiff in May 2003, shortly after his insured status expired. As

noted above, Dr. McIntosh found at that time that Plaintiff was not significantly

limited. The only significant restriction he noted was a mild to moderate

limitation in Plaintiff's ability to withstand the stress of normal work. Dr.

McIntosh assigned Plaintiff a GAF[2] score of 68. (Tr. 421).

---

[2]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Comm'r*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic & Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

Plaintiff objects that Dr. McIntosh did not review Plaintiff's medical records as a part of his evaluation. As the ALJ aptly noted, however, at the time of that evaluation — which was after Plaintiff's insured status had expired – no medical records of a psychological or psychiatric nature existed for Dr. McIntosh to review. (Tr. 26). The ALJ gave substantial weight to Dr. McIntosh's opinion because it was the professional mental health evaluation performed closest in time to the insured period at issue, as well as the most consistent with the medical evidence. (*Id.*).

Finally, to the extent that Dr. Valle's opinion can be read to express his broad view that Plaintiff was "disabled" for purposes of DIB benefits, his opinion on that ultimate issue of disability entrusted to the Commissioner is not binding on the ALJ. *See Kirk*, 667 F.2d at 538.

Accordingly, although Plaintiff's Statement of Errors suggests that the evidence should have been weighed differently, his assertions do not undermine the substantial evidence supporting the ALJ's assessment of the medical source opinions. *See Jones*, 336 F.3d at 477; *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). The ALJ's assessment of the medical evidence of record does not provide grounds for overturning his decision.

*ii. ALJ's Failure to Acquire Additional Medical Expert*

Plaintiff also argues that the ALJ should have secured the assistance of a medical expert to assist in determining whether the onset of Plaintiff's conversion disorder occurred before his last insured date of March 31, 2003. Under Social Security law, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination[ ] rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Id.* (citing 10 C.F.R. § 416.917(a)). The primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases. *See Richardson*, 402 U.S. at 408. The Commissioner's regulations provide that an ALJ may "ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404,1527(f)(2)(iii). An ALJ's decision whether a medical expert is necessary, however, is inherently discretionary. *See* HALLEX I-2-5-32, -34 (September 28, 2005). An ALJ thus abuses his discretion by failing to consult a

medical expert only when the testimony of such an expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations." *Haywood v. Sullivan,* 888 F.2d 1463, 1467-68 (5th Cir. 1989) (citing 20 C.F.R. § 416.1444). Accordingly, "'full inquiry' does not require a consultative examination . . . unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (citation omitted) (emphasis in original).

Here, the administrative law judge did not abuse his discretion. ALJ Padilla's decision included a fair recitation of the evidence and included thorough, well-documented findings supporting the conclusion that Plaintiff was not disabled. (Tr. 18-30). As Plaintiff failed to show that he was disabled prior to his last insured date of March 31, 2003, the ALJ's non-disability determination was not erroneous.

## IT THEREFORE IS RECOMMENDED THAT:

1.  The Commissioner's final non-disability determination be AFFIRMED; and

2.  This case be TERMINATED on the docket of this Court.


February 13, 2009                         _____s/ Sharon L. Ovington_____
                                                    Sharon L. Ovington
                                                United States Magistrate Judge

24

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen (13) days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).